Filed 7/25/13  Marriage of Beyer CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re the Marriage of MICHAEL A. and JOSEFINA BEYER. | |
| MICHAEL A. BEYER, | E054917 |
| Appellant, | (Super.Ct.No. SWD011015) |
| v. | OPINION |
| JOSEFINA BEYER, | |
| Respondent. | |

APPEAL from the Superior Court of Riverside County.  Judith C. Clark, Judge.

Affirmed.

Haslam & Perri and Brian G. Thorne for Appellant.

No appearance for Respondent.

I

INTRODUCTION[1]

In a dissolution of marriage proceeding, Michael A. Beyer (husband) appeals

judgment entered following a contested trial.[2]  Husband contends the trial court erred in

vacating the spousal support termination date entered in a stipulated interlocutory order.

Husband also challenges the trial court's denial of his request for *Epstein*[3] credits and

reimbursement for education expenses and overpaid child support.  We conclude the trial

court had jurisdiction to eliminate the spousal support termination date, and there was no

abuse of discretion in doing so.  Additionally, we conclude the trial court did not abuse its

discretion in denying husband's request for *Epstein* credits or for reimbursement of

education costs or child support paid in August and September 2008.  The judgment is

affirmed.

II

FACTS AND PROCEDURAL HISTORY

Husband and wife (the parties) married in 1991, and separated on January 15,

2007.  Husband filed a petition for dissolution of the marriage on January 23, 2007, and

thereafter amended the petition.  Wife filed a response in February 2007.  Husband and

wife were married 16 years and have two children:  Alexander, who was born in 1991,

---

[1]  Unless otherwise noted, all statutory references are to the Family Code.

[2]  Josefina Beyer (wife) has not filed a respondent's brief.

[3]  *In re Marriage of Epstein* (1979) 24 Cal.3d 76, 84 (*Epstein*).

2

and was 15 years old at the time of his parents' separation, and Natalie, who was born in 1995, and was 11 years old.

Husband moved out of the family residence in January 2007, and moved back in in April 2007. From April 2007, until January 2008, husband and wife lived together with the children in the family residence. Husband moved out again in January 2008. Wife remained in the home until April 2008.

On April 14, 2008, husband and wife entered into a stipulation and order to show cause (OSC) for temporary orders regarding child custody, visitation, child support and spousal support. The parties agreed to wife moving out of the family residence, with husband taking exclusive use and possession of the home. Husband and wife also agreed to an Evidence Code section 730 psychological evaluation (730 evaluation). The stipulated order required husband to pay $1,394 per month in child support, based upon a 50 percent timeshare of the children, until further order of the court. The court also ordered husband to pay $1,086 in spousal support per month. Husband moved back into the family residence and took exclusive possession on April 22, 2008.

On August 13, 2008, husband filed an OSC requesting modification of child custody, visitation, child support, spousal support, attorney's fees and costs, and for reimbursement of the children's educational and extracurricular expenses. Husband requested a reduction in child support based on Alexander choosing to remain in husband's home, and wife rarely visiting him.

On September 25, 2008, the parties stipulated and the court ordered that wife's timeshare for both children was 27.49 percent and a reduction of child support to $490,

3

beginning October 1, 2008. The stipulated order reserved determination of whether the reduction in child support would apply retroactively, resulting in reimbursement for child support paid in excess of $490, during the months of August and September 2008.

At a mandatory settlement conference (MSC) on April 27, 2009, the trial court ordered husband to pay spousal support retroactively from April 1, 2008, through April 1, 2016, with spousal support terminating on April 1, 2016, under *In re Marriage of Richmond* (1980) 105 Cal.App.3d 352.

At a mandatory dispute resolution conference on August 31, 2009, the parties entered into a partial stipulation for judgment, in which the parties reserved determination of various issues, including child support and spousal support arrearages and *Epstein* credits.

Trial on the marital dissolution began on July 16, 2010, and was completed on March 25, 2011. On April 7, 2011, the trial court stated on the record, in the absence of the parties, its findings and decision.[4] Husband was ordered to prepare within 90 days, a proposed final statement of decision for approval of the court, based on the transcript of the court's statement of decision. Apparently, as a consequence of husband failing to

---

[4] The clerk's minute order indicates that the trial court's oral statement of decision was recited on April 26, 2011, with notice provided by the court clerk, dated April 27, 2011. However, the reporter's transcript of the hearing, during which the court announced its statement of decision, is dated April 7, 2011, and the reporter's certificate of the transcript states she reported the proceeding on April 7, 2011. Therefore we will assume the trial court stated its decision in open court on April 7, 2011, rather than on April 26 or 27, 2011.

4

prepare a proposed final statement of decision, mother submitted a proposed judgment, which the trial court executed and filed on September 12, 2011.

III

SPOUSAL SUPPORT

Husband contends the trial court did not have jurisdiction to set aside the stipulated interlocutory spousal support order, and doing so in the final dissolution judgment on September 12, 2011, was an abuse of discretion. On April 27, 2009, the parties stipulated to a *Richmond* order, which provided for a support termination date of April 1, 2016. Husband argues that the trial court erred in later setting aside the interlocutory stipulated order.

A. *Background Facts*

During an MSC on April 27, 2009, husband's attorney informed the court that the parties had met and reached an agreement as to certain terms. Husband's attorney explained that wife would not agree to modifying the amount of spousal support, but the parties agreed "to terminate spousal support at eight years which is exactly one-half the length of the marriage. The order is retro to April 1, 2008 so that would be April 1, 2016." When the court asked if the current court-ordered spousal support amount would remain until April 1, 2016, husband's attorney replied: "No. It's not a non-modifiable order, no. We're just asking for a termination date pursuant to *Richman* [*sic*] on 2008 – 16." Wife confirmed that this was what she wanted and no one had threatened or coerced her into agreeing to the April 1, 2016, spousal support termination date.

5

In accordance with the parties' stipulation in open court, the trial court ordered the following regarding spousal support: "That spousal support to be paid retroactively to April 1, 2008 and through April 1, 2016;" "That spousal support be terminated on April 1, 2016, Pursuant to *In Re The Marriage of Richmond*;" and "That the spousal support order is not a non-modifiable order." The interlocutory order incorporated the transcript of the April 27, 2009, MSC hearing.

After completion of the marital dissolution trial in March 2011, the trial court stated its findings and orders in open court on April 7, 2011. The final judgment of dissolution, entered on September 12, 1011, incorporated the trial court's April 7, 2011, statement of decision. The minute order and reporter's transcript, reflecting the trial court's statement of decision, state the following findings and orders regarding spousal support made pursuant to section 4320:

"The court previously ordered that spousal support would cease on April 1st, 2016, at a point equaling one half the length of the marriage. Recent case law makes it clear that an arbitrary order of this nature, absent a stipulation between the parties, is not appropriate. [¶] The Court must make a considered evaluation of the factors included within Family Code Section 4320 in order to end spousal support, and the Court should continue to maintain jurisdiction over the issue in cases where there's a long term marriage.

"The court therefore finds in balancing all of the above factors that spousal support should continue payable from petitioner to respondent in the amount of $1,750 per month, commencing April 1st, 2011. The Court continues to reserve jurisdiction over

6

the issue of spousal support. This court sets aside the previous order for spousal support to end in April 2016, and orders that support continue until the remarriage of the supported spouse, the death of either party, or further order of this Court."

The judgment states that the trial court found that the parties' 16-year marriage was a long-term marriage, with the date of separation on January 15, 2007. The judgment further states the following with regard to spousal support: "Petitioner/Husband shall pay to Respondent/Wife the amount of $1750 per month commencing April 1, 2011. The Court shall continue to reserve jurisdiction over the issue of spousal support. *This Court sets aside the previous order for spousal support to end in April 2016 and orders that support continue until remarriage of the supported spouse, the death of either party or further order of this Court.*" (Italics added.)

B. *Discussion*

Husband contends the trial court did not have jurisdiction to set aside the spousal support termination date of April 16, 2016, because the parties stipulated to the term and the trial court included it in the April 27, 2009, stipulated order. Husband argues that the time period to set aside the 2009 stipulated order, under Code of Civil Procedure sections 473 and 1008, had run by the time of the order on April 7, 2011, vacating the April 16, 2016, termination date. Also, the support order could not be set aside under sections 2123 and 3690 because there was no showing of actual fraud, perjury, or lack of notice.

We conclude the trial court was not precluded under sections 2123 or 3690, or Code of Civil Procedure sections 473 and 1008, from changing the April 1, 2016, support termination date, since the order was an interlocutory support order. Furthermore, the

7

stipulated order does not explicitly state that the trial court could not change, alter or modify the termination date of April 1, 2016.

The trial court acknowledged in its statement of findings on April 7, 2011, that it had previously ordered that spousal support terminate on April 1, 2016, but absent a stipulation between the parties, such an order was arbitrary and inappropriate. The court noted that in a long-term marriage, as in the instant case, the trial court must consider the factors enumerated in section 4320 for purposes of determining whether the court should continue jurisdiction and extend spousal support. In considering such factors, the trial court concluded that ordering termination of spousal support on April 1, 2016, was inappropriate and ordered spousal support continued indefinitely until wife's remarriage, the death of either party, or upon further order of the court.

Although the parties stipulated to terminating spousal support on April 1, 2016, this was in the context of a *Richmond* order, in which the termination date is modifiable. There was no express, unambiguous agreement to an absolute termination date for spousal support, with no possibility of extending support in the event wife was not self-supporting by April 1, 2016. The April 27, 2009, order did not expressly contemplate or preclude modification. Under such circumstances, the trial court had jurisdiction to change the termination date of April 1, 2016. An agreement can be found nonmodifiable only if there is a specific expression of an intent to prevent modification. (*In re Marriage of Jones* (1990) 222 Cal.App.3d 505, 509-511; *In re Marriage of Ousterman* (1996) 46 Cal.App.4th 1090, 1095 (*Ousterman*).)

8

In *Ousterman*, the parties to a marital dissolution proceeding, stipulated to a court order that the wife would receive spousal support in a specified amount and "'*The spousal support payments . . . and the requirements . . . shall not be modifiable on any ground . . . on or before January 31, 1995, by any means, including court order, except by the written agreement of both parties*.'" (*Ousterman, supra,* 46 Cal.App.4th at pp. 1092-1093, original italics.)

Unlike in the instant case, in *Ousterman* the support order did not contain language expressly terminating support at a stated time but rather provided for a period of support and prohibited modification on or before the termination date. However, *Ousterman* is instructive in explaining that "[a] spousal support order may be modified or terminated unless a written agreement or oral agreement entered into in open court between the parties prohibits modification or termination. (§ 3651, subds. (a), (d).[])" (*Ousterman, supra,* 46 Cal.App.4th at p. 1094.) The court in *Ousterman* concluded that, "[h]ad the parties intended to preclude any possibility of modification either before, on or after January 31, 1995, they could have said so by simply stating the agreement was nonmodifiable." (*Ibid.*) In the instant case, there was no provision stating the stipulated spousal support termination date was nonmodifiable.

Father argues that, although the support stipulation in the instant case allowed modification of the amount of support, the parties expressly stated that support terminated on a specific date, and this term was nonmodifiable. But the stipulated order is ambiguous in this regard since the stipulated order does not differentiate between nonmodification of the support amount verses the termination date. The stipulated order

9

merely states "the spousal support order is not a non-modifiable order." In the absence of clear and unambiguous language in the stipulated interlocutory order stating that the termination date was nonmodifiable, the support termination date was modifiable at the time of trial. "[T]he lack of a specifically demonstrated intention to preclude modification requires a finding that the agreement was in fact modifiable . . . ." (*Ousterman, supra,* 46 Cal.App.4th at p. 1095.)

As noted in *Ousterman*, *In re Marriage of Vomacka* (1984) 36 Cal.3d 459 (*Vomacka*) and its progeny held that the court had jurisdiction to extend support beyond the agreed upon date for termination of spousal support, unless the agreement explicitly states an intent to preclude jurisdiction to extend support beyond the specified expiration date. (*Ousterman, supra,* 46 Cal.App.4th at p. 1097.) In *Vomacka*, the spousal support agreement provided for payment of a specified amount of support "'until further order from the Court, the death of either party, the remarriage of [wife], or August 1, 1982, whichever first occurs. *The Court shall retain jurisdiction regarding spousal support until September 1, 1984, at which time [wife's] right to request spousal support from [husband] shall terminate forever.*'" (*Vomacka, supra,* 36 Cal.3d at pp. 461-462, original italics.)

In concluding the court retained jurisdiction to modify support after the date specified in the support agreement, the court in *Ousterman* explained that in *In re Marriage of Vomacka, supra,* 36 Cal.3d 459, "The court rejected the husband's argument that jurisdiction over support ended on the date specified in the original agreement,

10

finding that the court had jurisdiction *until* that date to modify the award, including to extend the duration of support." (*Ousterman, supra,* 46 Cal.App.4th at pp. 1095-1096.)

*Vomacka*'s finding of implied retention of jurisdiction to extend support beyond the support termination date was based on the following policy reasons: "First, especially in the case of marriages of long duration, orders providing for absolute termination of spousal support on a specified date are disfavored unless the record clearly indicates the supported spouse will be able to adequately meet his or her financial needs at the time specified for termination. ([*Vomacka, supra,*] 36 Cal.3d at p. 467.) Second, 'where there is an ambiguity in the language of a marital property agreement it must be decided in favor of the right to spousal support.' (*Id.* at p. 469.) Finally, 'language in a spousal support order suggesting that modification of its terms will be permitted is routinely interpreted as a retention of the court's fundamental jurisdiction to modify and, upon a proper factual showing, to extend the spousal support provisions contained therein.' (*Id.* at p. 470.)" (*Ousterman,* at p. 1096.)

As concluded in *Ousterman*, *Vomacka*, and their progeny, "'to be effective, language in a marital agreement intended to preclude jurisdiction to extend support had to be stated rather explicitly. Implications drawn from the agreement suggesting possible intention to reserve jurisdiction would be favored.'" (*Ousterman, supra,* 46 Cal.App.4th at p. 1097, quoting *In re Marriage of Jones*, *supra*, 222 Cal.App.3d at p. 512.) As in the instant case, in *Vomacka*, the trial court modified the stipulated spousal agreement and judgment to extend spousal support beyond the date stipulated as the date of termination of the court's spousal support jurisdiction. (*Vomacka, supra,* 36 Cal.3d at p. 461.) The

11

court in *Vomacka* held that the trial court had jurisdiction to extend spousal support beyond the specified date. (*Ibid.*) Likewise, in the instant case, we conclude that, because the stipulated support order does not explicitly preclude modifying the support termination date and does not expressly state that jurisdiction over support terminated on April 1, 2016, the trial court had jurisdiction to modify the spousal support termination date of April 1, 2016.

In addition, husband's attorney told the court that the parties intended that the spousal support order constitute a *Richmond* order, which implies that the termination date can be extended. Under *Richmond*, support could be extended if the trial court found that mother was not capable of supporting herself by April 1, 2016. This is because it has long been established that "termination of jurisdiction over spousal support after lengthy marriages should not occur without proof the supported spouse can provide for his or her own reasonable needs." (*In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 661 (*Prietsch*), citing *In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453.) Therefore, since there is no written agreement or order expressly terminating jurisdiction or prohibiting modification of the support termination date of April 1, 2016, the trial court was not precluded from changing the *Richmond* order, spousal support termination date.

We further conclude the trial court did not abuse its discretion in eliminating the April 1, 2016, termination date, because there was substantial evidence establishing that it was unlikely mother would succeed in becoming self-supporting under section 4320 by that date; that is, she would not be able "to maintain the standard of living established

12

during the marriage." (§ 4320, subd. (a).) The trial court stated on the record that it had considered the various relevant factors determinative of whether a *Richmond* order was appropriate, and found that mother would not be able to become self-supporting by April 1, 2016. There was substantial evidence to support this finding, particularly since "[t]he longer the marriage the more likely it is that it will constitute an abuse of discretion for the court to fix a date for termination of jurisdiction over the issue of future spousal support without a clear showing that it is reasonably probable the supported spouse will be self-sufficient by the termination date." Here, the marriage was a long-term marriage and there was not a clear showing at the time of the dissolution trial, that wife would be self-supporting under section 4320 by the termination date of April 1, 2016. (*Prietsch, supra,* 190 Cal.App.3d at p. 663.)

We note that the instant spousal support order, which eliminated the *Richmond* order termination date of April 1, 2016, does not preclude the trial court from altering, modifying or terminating spousal support in the future, upon a showing of changed circumstances. (§ 4336, subd. (c); *In re Marriage of Christie* (1994) 28 Cal.App.4th 849, 858.) In addition, notwithstanding a long-term marriage and the absence of changed circumstances, a postjudgment termination of spousal support may be appropriate if, after weighing the parties' then-existing circumstances and section 4320 factors, the trial court otherwise finds it would be "just and equitable" to do so. (*In re Marriage of Baker* (1992) 3 Cal.App.4th 491, 494, 501-502.)

13

IV

*EPSTEIN* CREDITS

Husband contends the trial court erred in denying husband $6,140.42 in *Epstein* credits and rejecting his request for reimbursement for his children's educational expenses amounting to $11,718.12 for secondary school expenses and $12,128.21 for Alexander's college costs.

*A. Background Facts*

At the time of the stipulated separation date of January 15, 2007, the parties had $6,140.42 in miscellaneous community debts, incurred before separation but paid by husband after separation with his separate property. Those debts included the following items: a $1,050.85 Discover Platinum card debt; a $156.67 Kohl's bill; a $108.51 California Edison bill; a $23.50 AT&T bill; a $69.76 Verizon West bill; a $119.99 Southern California Gas Company bill; a $309 Department of Motor Vehicles bill; a $156 Ballet Temecula bill; and a $4,146.14 USAA Visa/MasterCard bill.

In addition, after husband moved back into the family residence and was living with his family from April 2007 through December 2007, husband continued paying for all of his family's living expenses, including $11,718.12 for his children's private school educational expenses, between February 22, 2007, and December 5, 2007, and $12,128.21 for Alexander's college costs, from January 7, 2008, to April 23, 2009.

Following the marital dissolution trial, the trial court denied husband's request for reimbursement for $6,140.42 in community debts, $11,718.12 for the secondary school education expenses, and $12,128.21 for Alexander's college costs. The trial court stated

14

during its statement of decision on April 7, 2011, regarding *Epstein* credits and reimbursement: "The evidence presented show that the parties initially separated in mid-January 2007. They remained separated until April 1st, 2008, at which time petitioner [husband] moved back into the home. [¶] Respondent [wife] testified that from April 2007 until January 2008, the parties were reconciled and living as husband and wife. . . . [¶] . . . [¶] Petitioner testified that they did meet to discuss terms for reconciliation, but that the terms were never met. He did move back into the home, but solely for the benefit of the children. His testimony was that petitioner and respondent engaged in marital relations only a few times, and that for the majority of the period in question, he slept in the master bedroom with the doors locked and the handles tied shut. [¶] It appears from the testimony that the parties did attend counseling together, though respondent did not commence individual therapy at that time. Petitioner was in sole control of the money, and that petitioner purchased respondent a ticket to take a Thanksgiving cruise with the children as a family that fall; though she decided not to attend."

The trial court noted that, despite evidence that the parties reunited in April 2007, the parties stipulated that the date of separation was January 2007, and the court accordingly found that the date of separation was January 15, 2007, "for purposes of calculating points and time and service for division of the military retirement." However, the trial court found, based on the evidence, that the parties had actually temporarily reconciled during the period of April through December, 2007. This finding was based on evidence that the parties "were handling the finances of the home in the same manner as had been done prior to their initial separation. Further, petitioner took steps to

15

facilitate both parties taking a family vacation together.  The Court does not find petitioner's testimony to be credible regarding the conditions in the home during the time in question."

Although the court acknowledged it was bound by the stipulation as to the separation date, wife, "in reliance on her belief that they were reconciled, bypassed her right to seek and receive spousal support.  The agreement for petitioner to control all funds and pay all community expenses, constitutes an implicit agreement for respondent not to seek spousal support."  The trial court found that "it would be inequitable and worth a windfall to the petitioner if he were awarded reimbursements for the community debts, utilities, or medical expenses of the children incurred during this time."  The court therefore concluded that husband was not entitled to reimbursement for the community debts incurred before January 2008.

As to husband's request for reimbursement of the high school and college expenses, the trial court found that "there was no agreement between the parties for these expenses to be borne equally.  And respondent has no obligation to pay petitioner back for these expenses . . . ."

B.  *Applicable Law*

Under section 2626, "The court has jurisdiction to order reimbursement in cases it deems appropriate for debts paid after separation but before trial."  In *Epstein, supra,* 24 Cal.3d 76, the California Supreme Court held that where one spouse, after separation, uses his or her earnings or other separate funds to pay a preexisting community debt, that spouse is entitled to reimbursement from community property.  (*Id.* at pp. 83-84.)  The

16

purpose of this rule is to encourage a spouse who has the wherewithal to do so to use post separation income to pay community debts in order to avoid exacerbating the financial and emotional disruption which "'all too frequently accompanies the breakup of a marriage and, perhaps, result in impairing the credit reputations of both spouses.'" (*Id.* at p. 84, quoting *In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 747 [Fourth Dist., Div. Two].)

The *Epstein* court noted that applying the then-existing presumption of nonreimbursement would have the anomalous result that "'community obligations which would otherwise be charged against community property and borne by the parties equally are [either left unpaid or] charged exclusively to the paying spouse.'" (*Epstein, supra,* 24 Cal.3d at p. 84.) However, the court clarified that reimbursement is the general rule only and should not apply where the "payment was made under circumstances in which it would have been unreasonable to expect reimbursement." (*Id.* at pp. 84-85; see also *In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1272 [award of *Epstein* credits is discretionary].)

*C. Discussion*

The trial court did not abuse its discretion in denying husband's request for reimbursement for community debts and educational expenses paid after the January 2007 separation date. As concluded by the trial court, the circumstances were such that it was unreasonable for husband to expect reimbursement. The record supports the trial court's determination that such reimbursement was unwarranted because husband had the sole control of the finances, with wife receiving a monthly allowance. The court found

17

that the parties in actuality reconciled during the period of April to December 2007, and it would have been inequitable to require wife to reimburse husband for paying community debts and the children's education during that time. Husband chose to pay these expenses after the parties had reunited and were living together as a family unit, in the family home, from April 2007 through December 2007. There was no evidence of any agreement or belief that husband would be reimbursed and, during that time, wife was not receiving any support. Rather, the record shows that husband and wife were attempting to live as husband and wife, without any intention of husband being reimbursed for paying the family's community bills.

As to the educational expenses, they were incurred after the stipulated separation date and therefore did not qualify as *Epstein* credits. In addition, the $11,718.12 for the children's private school educational expenses was incurred primarily while the family was living together in 2007. Alexander's college expenses were also paid after the separation date of January 15, 2007, and continued after the parties separated again in January 2008. Reimbursement under *Epstein* and section 2626 is an equitable analysis. Under the circumstances in the instant case, the trial court reasonably concluded it would have been unreasonable and inequitable to expect reimbursement from wife for the family's community debts and educational expenses. The trial court thus did not abuse its discretion in denying husband's request for *Epstein* credits and for reimbursement of the children's education expenses. (*In re Marriage of Hebbring, supra,* 207 Cal.App.3d at p. 1272 [award of *Epstein* credits is discretionary].)

## CHILD SUPPORT REIMBURSEMENT

Husband contends the trial court erred in denying his request for reimbursement for $2,961.50 in child support, paid in August and September 2008. Husband argues he paid more than he should have paid because Alexander lived with him and wife rarely visited Alexander, whereas child support was based on a 50/50 timeshare.

*A. Factual and Procedural Background*

On April 14, 2008, the parties stipulated to, and the trial court ordered, child custody, visitation, and child support. The parties agreed husband would pay wife $1,394 a month in child support until further order of the court, based on a 50/50 timeshare. The parties acknowledged that Alexander was of an age to decide whether he wished to alternate between living at wife's home and husband's home. It was also agreed the parties would complete a 730 evaluation.

On August 13, 2008, husband filed an OSC requesting reimbursement for $2,961.50 for child support overpayments made by husband, retroactive to the date he filed his OSC request for a reduction in child support. Husband based his request on Alexander living with father the entire time, and mother rarely visiting Alexander. On September 25, 2008, the parties stipulated and the trial court ordered child support reduced to $490, based on a 27.49 percent timeshare, effective October 1, 2008. Husband's OSC request for child support reimbursement for overpayment of child support in August and September was reserved by the trial court until the time of trial on the marital dissolution petition.

During the trial, husband testified he paid $2,547.50 in child support in August 2008, and $1,394 in September 2008. Husband claimed that he should have only been paying $490 a month in August and September 2008, as was later ordered on September 28, 2008, effective October 1, 2008. Husband explained that he believed he was entitled to reimbursement for $2,961.50 in child support because wife moved out of the family home in April 2008, and moved into a two-bedroom apartment in which there was not enough room for both children to live with her. Alexander was told he had to sleep on the sofa and therefore decided to live the entire time with husband in the family home. Wife spent very little time with Alexander during the months of August and September 2008.

The trial court noted that husband stipulated in the April 2008 to child support based on a timeshare of 50/50, knowing that Alexander might not choose to live half the time with wife and the timeshare might not be 50/50. When asked why he stipulated to the child support terms, husband testified that at the time of the agreement, Alexander's relationship with wife had not deteriorated and there was an expectation Alexander would participate in 50/50 visitation. As a result of wife not providing Alexander with a place to sleep, this did not occur.

Following the trial, the trial court stated in its statement of findings that on April 14, 2008, the parties entered into a stipulation whereby the child support was calculated based on a 50/50 timeshare, pending a 730 evaluation, calendared for September 28, 2008. The trial court noted that it was improper to modify the stipulated order, including custody and visitation, until after the 730 evaluation, and support was not reduced to

20

$490 until thereafter. The trial court therefore denied husband's request for child support reimbursement.

*B. Applicable Law*

Section 3603 provides that an order for child support "may be modified or terminated at any time except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." Section 3653 provides: "(a) An order modifying or terminating a support order may be made retroactive to the date of the filing of the notice of motion or order to show cause to modify or terminate, or to any subsequent date, except as provided in subdivision (b) or by federal law (42 U.S.C. Sec. 666(a)(9))."

Under federal law, each state must have in effect procedures "which require that any payment or installment of support under any child support order, whether ordered through the State judicial system or through the expedited processes required by paragraph (2), is (on and after the date it is due) [¶] (A) a judgment by operation of law, with the full force, effect, and attributes of a judgment of the State, including the ability to be enforced, [¶] . . . , and [¶] (C) not subject to retroactive modification by such State or by any other State; [¶] except that such procedures may permit modification with respect to any period during which there is pending a petition for modification, but only from the date that notice of such petition has been given, either directly or through the appropriate agent, to the obligee or (where the obligee is the petitioner) to the obligor." (42 U.S.C. § 666(a)(9).)

21

Section 3653, subdivision (d) provides that, if an order decreasing "a support order is entered retroactively pursuant to this section, the support obligor may be entitled to, and the support obligee may be ordered to repay, according to the terms specified in the order, any amounts previously paid by the support obligor pursuant to the prior order that are in excess of the amounts due pursuant to the retroactive order. . . . In determining whether to order a repayment, and in establishing the terms of repayment, the court shall consider all of the following factors:  [¶]  (1) The amount to be repaid.  [¶]  (2) The duration of the support order prior to modification or termination.  [¶]  (3) The financial impact on the support obligee of any particular method of repayment such as an offset against future support payments or wage assignment.  [¶]  (4) Any other facts or circumstances that the court deems relevant."

*C.  Discussion*

In the instant case, when the court ordered child support reduced to $490 on September 25, 2008, the trial court could have ordered that the modified support was retroactive to the date husband filed his OSC petition on August 13, 2008.  The trial court, however, did not do so.  Instead, the parties stipulated, and the court ordered, October 1, 2008, as the effective date of the reduced support, with the husband's request for child support reimbursement for the months of August and September reserved for later determination at trial.

Based on husband's testimony and the record as a whole, we conclude the trial court appropriately exercised its discretion in denying husband child support reimbursement for the months of August and September 2008.  Husband testified at trial

22

that, when he stipulated in April 2008, to pay $1,394 in child support, based on a 50/50 timeshare, he was fully aware of the uncertainty as to how much time Alexander would be living with him. At the time of the stipulated child support order, the parties had just agreed that wife would move out of the family home and husband would move in. The parties and their children had not yet experienced the changed living arrangement. The parties acknowledged in the stipulation that Alexander was of an age in which he could decide whether he wanted to move back and forth between husband and wife's homes. Despite the uncertainty as to how much time Alexander would be spending with each parent, the parties agreed to husband paying $1,394 in child support based on a 50/50 timeshare.

The record thus reflects that husband was fully aware of the possibility that the timeshare might not be 50/50 but nevertheless agreed to pay $1,394 a month in child support until further ordered by the court. Since the parties also stipulated to completing a 730 evaluation, the trial court reasonably concluded that the parties understood that the agreed upon child support was temporary because it was based on uncertain terms, and would not be modified until after the 730 evaluation. Upon completion of the 730 evaluation, the court would likely reevaluate and modify child custody, support and visitation, taking into consideration the recommendations provided in the 730 evaluation report. Under these circumstances, the trial court's denial of husband's request for reimbursement of a portion of the child support paid in August and September 2008 was reasonable and well within the court's discretion.

23

# VI

## DISPOSITION

The judgment is affirmed.  The parties are ordered to pay their own costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
P. J.

We concur:


RICHLI_____
J.


MILLER_____
J.

24